

1998 Decisions

10-29-1998

# United States v. Brown

Precedential or Non-Precedential:

Docket 98-7057

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Brown" (1998). *1998 Decisions*. Paper 255.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/255

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 29, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-7057

UNITED STATES OF AMERICA,

v.

KENNETH C. BROWN,

      Appellant.

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(D.C. No. 97-CR-00144)

ARGUED AUGUST 4, 1998

BEFORE: Nygaard, Alito, and Rendell, Circuit Judges.

(Filed October 29, 1998)

      Daniel I. Siegal
      Office of the Federal Public Defender
      Suite 306
      100 Chestnut Street
      Harrisburg, PA 17101

      Attorney for Appellant

          Theodore B. Smith, III
          Office of the U.S. Attorney
          Federal Building
          228 Walnut Street
          PO Box 11754
          Harrisburg, PA 17108

          Attorney for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Kenneth Brown appeals the district court's denial of his
motion to suppress evidence discovered during a stop and
frisk conducted by York City, Pennsylvania police officers.
Brown claims that the stop and subsequent "pat-down"
were not based on facts sufficient to support a warrantless
stop under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968).
We have jurisdiction under 28 U.S.C. S 1291. We review the
factual findings of the district court for clear error. See
United States v. Roberson, 90 F.3d 75, 77 (3d Cir. 1996)
(citing Ornelas v. United States, 517 U.S. 690, 699-700, 116
S. Ct. 1657, 1662-63 (1996)). We review the district court's
conclusion that there was reason to conduct the Terry stop
de novo. See id. We will affirm.

I.

At approximately 1:30 a.m. on January 24, 1996, York
City police officers received a radio call of "shots fired" in
the 700 block of West King Street--an area known as a
"very high crime area." Shortly thereafter, a second radio
transmission reported that two victims of the shooting had
been taken away by a private vehicle. Officer Michael
Koltunovich, a uniformed police officer in a marked police
vehicle, immediately responded. As he approached the area,
he saw five African American men walking in the vicinity of
the reported crime scene along West Princess Street. Except
for these five men, the streets were deserted. Koltunovich
stopped his vehicle and asked the men to "hold up." Two
men stopped, were frisked for weapons, questioned and

                         2

released. The other three men continued walking. Koltunovich radioed a description of the three men and stated that one (Brown) wore a black leather jacket and bright white knit cap.

Uniformed Officer Todd Ross was also on patrol that night in a marked police vehicle. As Ross responded to the "shots fired" call, he heard Koltunovich radio that three potential suspects were walking east along West Princess Street. Within seconds after receiving the radio transmission, Ross saw Brown on West Princess Street near the crime scene wearing a black leather jacket and bright white knit cap. When Ross stopped his vehicle, Brown turned and ran into an alley. Ross radioed this information. Koltunovich then radioed that he saw Brown enter Gus's Bar. Ross entered the bar and saw a white knit cap next to a man wearing a black leather jacket. The man stated that the cap was his and that he had a weapon. Koltunovich entered the bar and identified Brown as the person who had walked away from him earlier that night. The police officers frisked Brown and found an unloaded, sawed-off .22 caliber rifle. Brown was arrested and taken to the police station where they conducted a thorough search and found drugs, money and ammunition. A grand jury indicted Brown for one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. S 922(g)(1) and one count of possession of an unregistered sawed-off rifle in violation of 26 U.S.C. S 5861(d). Brown was not charged with the shootings.

Brown moved to suppress: (1) his statement admitting possession of the firearm; (2) the firearm; (3) the ammunition; and (4) the drugs. Brown claims that the officers lacked the reasonable suspicion required to conduct a warrantless stop and frisk. Brown argues that the only basis for the stop and frisk was that he fled from police and that this, without more, is insufficient to justify a Terry stop. The district court found that reasonable suspicion supported the Terry stop and denied the motion to suppress. Brown now appeals that order.

II.

In Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968), the Supreme Court held that a police officer may

conduct a warrantless stop and frisk if specific and articulable facts, together with all rational inferences, suggest that the suspect was involved in criminal activity. This investigatory stop is short of an arrest and can be justified by "less than the probable cause necessary for an arrest." Roberson, 90 F.3d at 77. However, a mere "hunch" or "inchoate and unparticularized suspicion" cannot justify a stop and frisk under Terry. See Terry, 392 U.S. at 27, 88 S. Ct. at 1883. Deference, however, is given to the officer's conclusions based on the officer's experience. See United States v. Rickus, 737 F.2d 360, 365 (3d Cir. 1984) (citing United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981)). An officer cannot conduct a Terry stop simply because criminal activity is afoot. See Terry, 392 U.S. at 29, 88 S. Ct. at 1884. Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity. See United States v. Cortez, 449 U.S. 411, 417–18, 101 S. Ct. 690, 695 (1981).

Brown contends that his flight from police is insufficient to support a Terry stop and frisk. We disagree.* We have held that flight combined with other factors may support a warrantless stop and frisk. See United States ex rel. Richardson v. Rundle, 461 F.2d 860, 863–64 (3d Cir. 1972). These other factors, apropos to Brown's stop include: (1) the reputation of an area for criminal activity, see Rickus, 737 F.2d at 365; (2) a suspect's flight upon seeing his companion questioned and frisked by officers, see United States v. Embry, 546 F.2d 552, 555 (3d Cir. 1976); and (3)

_____

* Brown relies on LaFave, Search and Seizure, S 3.6(e) (3d Ed. 1997) (citing United States v. Margeson, 259 F. Supp. 256, 265 (E.D. Pa. 1966)) (stating that "[t]he flight of a person from the presence of police is not standing alone sufficient to establish probable cause"), and United States v. Young, 598 F.2d 296, 304 (D.C. Cir. 1979) (Robinson, J., concurring) (commenting that "association with a supposed criminal does not necessarily blossom into probable cause, simply because of subsequent flight from oncoming police"), for the proposition that flight, alone, cannot justify a Terry stop and frisk. These authorities, however, discuss flight in the context of establishing probable cause for an arrest. Additionally, United States v. Duffy, 796 F. Supp. 1252, 1258 (D. Minn. 1992), which does hold that flight from police officers, without more, is insufficient to support a Terry pat-down, is not binding on us.

4

a suspect's attempts to elude police officers, see Rundle, 461 F.2d at 864 (citing Sibron v. New York, 392 U.S. 40, 66, 88 S. Ct. 1889, 1904 (1966)).

In Rundle, we noted that

> "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to evidence of crime, they are proper factors to be considered in the decision to make an arrest."

461 F.2d at 864 (quoting Sibron, 392 U.S. at 66, 88 S. Ct. at 1904). Rundle involved police officers on routine patrol in a high crime area who witnessed four youths running from a drug store around closing time. See id. at 862–64. The officers also knew that robberies generally occurred when stores opened or closed. See id. at 863. Therefore, based on their observances and experience, they concluded that "a crime was either being perpetrated or about to be perpetrated." Id. We held that the officers could have reasonably suspected that the youths committed a robbery and that the evidence obtained was admissible. See id. at 864.

This stop and frisk is similar. Koltunovich noticed five men walking in the vicinity of a reported crime scene. It was the middle of the night in the dead of winter and the streets were otherwise deserted. When Koltunovich approached, three men disregarded the officer's request to "hold up" and continued walking. Koltunovich then radioed a description of the men over the radio, stating that one man wore a black leather jacket and a bright white knit cap. Ross heard the broadcast and immediately saw a man fitting the description in the vicinity. When Ross began to approach, Brown ran away and attempted to elude him by ducking into an alleyway and a bar. These actions combined with the radioed information and surrounding circumstances are sufficient to justify an investigatory stop under Terry.

Further, Officer Koltunovich did not make his original assessment of the suspects based solely on the fact that the men were coming from the area of the reported shooting.

5

The record indicates that the area was known as a "very high crime" area. The men were in close proximity to the crime scene a few minutes after the call of "shots fired" was received. It was late at night and these men were the only persons in the area. These factors, when considered in combination with the officers' experience, are also sufficient to warrant in investigative stop under Terry. See Rickus, 737 F.2d at 365.

III.

Several specific and articulable factors contributed to the officers' decision that Brown could be a suspect in the West King Street shooting. Therefore, the evidence obtained during the Terry stop and frisk and subsequent police station search is admissible. Accordingly, we will affirm the district court's denial of Brown's motion to suppress.

RENDELL, Circuit Judge, dissenting:

I must respectfully dissent because the majority opinion approves a stop-and-frisk of Mr. Brown based on "nothing more substantial than inarticulate hunches" as proscribed by Terry v. Ohio, 392 U.S. 1, 22 (1968). Mr. Brown was merely near the wrong place at the wrong time. The evidence established that, at 1:30 a.m., the defendant and four other males were spotted walking south on Belvedere and turned onto Princess Street, "one block over" from the area of 700 West King Street, where the shootings were reported to have occurred.* There was no evidence to connect these men to the crime other than their having been the only ones seen by the police on the street in the general vicinity. The record contained no evidence as to when the shootings had occurred, how much time had elapsed between the shootings and the sighting of the five black males, and no evidence that the perpetrators were black, male, or that they were on foot. In fact, all the police knew was that "shots had been fired in the 700 block of West King Street," and "two victims of the shooting had been taken by a private vehicle to City Hall." For all the police knew at the time, the incident could have been a shootout with no perpetrators other than those injured.

Further, Brown did not flee when two of his companions were questioned; rather, two stopped, and the other three, including Brown, kept walking. He ran only later, when a police car kept pursuing him. While the majority opinion sidesteps the issue, flight alone, under these circumstances, should not provide probable cause for a Terry stop, because flight can be the result of legitimate concerns on the part of the person being pursued, and, on its own, does not indicate that criminal activity is afoot. See, e.g., United States v. Young, 598 F.2d 296, 304 (D.C. Cir. 1979) (Robinson, J., concurring); United States v.

_____

* Interestingly, a street map of York City shows the relevant portion of West King Street to be separated from Princess Street by several streets -- Light Alley, West Poplar Street, and School Place. See Mapquest, http://city.net/cgi/maps>. The record, however, contains only the officer's statement as to the geographic layout of the area. Appendix, p. 63.

7

Duffy, 796 F. Supp. 1252, 1258-59 (D. Minn. 1992); United States v. Margeson, 259 F. Supp. 256, 264 (E.D. Pa. 1966). While flight with more can justify a Terry stop, here there is nothing more.

Law enforcement officers made Brown a suspect merely by virtue of reporting the color of his hat and coat. The instant situation is clearly distinguishable from both United States v. Embry and United States ex rel. Richardson v. Rundle, on which the majority rely. In those cases there were facts which, when taken together with reasonable inferences drawn from those facts, justified an intrusion. Here, not only are there no facts that connect Brown with criminal activity, but, moreover, there are no inferences which can reasonably be drawn from facts of record which could do so. As Judge Seitz cautioned in his dissent from the majority opinion in United States v. Embry:

> Terry and its progeny do not license the police to stop individuals in public places on a bare suspicion or an intuition that they may be criminals, and it certainly does not permit random stops in an effort to turn something up. In every case, "the police officer must be able to point to specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant the intrusion."

546 F.2d 552, 558-59, citing Terry, 392 U.S. at 21.

Here, there are no such facts. We take a giant step backward in our Fourth Amendment jurisprudence in giving our stamp of approval to the police conduct in this case.

I would reverse.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

8